# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:13-CR-22-TLS |
| | ) | |
| JAVIER MADRIGAL | ) | |

## SENTENCING OPINION

The Defendant, Javier Madrigal, has pled guilty to distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1). An officer with the United States Probation Office prepared a Presentence Investigation Report (PSR) in anticipation of the Defendant's sentencing. The Defendant objects to certain portions of the PSR, arguing that the drug quantity calculation is incorrect, that he should not be assessed additional points for maintaining a drug premises, and that he should not be classified as an organizer, leader, manager, or supervisor. In addition to filing objections with the probation officer, the Defendant has submitted a Sentencing Memorandum [ECF No. 76], but he has not requested an evidentiary hearing. In the Response to the Defendant's Sentencing Memorandum [ECF No. 82], the Government asserts that the probation officer correctly calculated the Defendant's offense level and, in doing so, reiterates the arguments it presented to the probation officer in response to the Defendant's objections.

## BACKGROUND

The Defendant was the owner of a restaurant called Chilangos Tacos in Ligonier, Indiana. A confidential source (CS) working with federal drug agents identified the Defendant as a source of large quantities of crystal methamphetamine. The CS indicated that the Defendant's wife or girlfriend, Lizbeth Correa, also worked at the restaurant, and that Juan Sandoval

regularly obtained methamphetamine from the Defendant.

Agents then began an investigation that involved using the CS to conduct numerous controlled purchases of crystal methamphetamine from the Defendant. These purchases, as well as payments for a drug debt, took place at Chilangos Tacos. Following the last controlled purchase, on March 21, 2013, the Defendant was arrested and a search warrant was executed at the restaurant. Officers recovered the money from the controlled purchase as well as $31,000 from a safe, which included buy money from a previous controlled purchase. Two months later, individuals cleaning the former location of Chilangos Tacos as part of the purchase of restaurant equipment discovered a bag of crystal methamphetamine with an actual drug weight of 152.3 grams.

## ANALYSIS

"When calculating a sentence, a district court first calculates the proper range under the sentencing guidelines. It then considers that guideline range in addition to any of the other relevant sentencing factors under 18 U.S.C. § 3553(a) before arriving at the appropriate sentence." *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008).

### A.     Drug Quantity

In determining the amount of drugs involved in the Defendant's offense, the Court may rely on any evidence that has a "sufficient indicia of reliability." *United States v. Goodwin*, 496 F.3d 636, 643 (7th Cir. 2007). The standard of proof employed is the preponderance of evidence. *Id.*; *see also United States v. Davis*, 682 F.3d 596, 612 (7th Cir. 2012) ("At sentencing, a district

court need only make findings of fact, such as the quantity of drugs attributable to a defendant, by a preponderance of the evidence.") (citing *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008)); *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009) (stating the facts relevant to sentencing should be proved by a preponderance of the evidence). "A proposition proved by a preponderance of the evidence is one that has been shown to be more likely than not." *Davis*, 682 F.3d at 612.

"Sentencing judges necessarily have 'discretion to draw conclusions about the testimony given and evidence introduced at sentencing,' but 'due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations.'" *United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010) (quoting *England*, 555 F.3d at 622). "A district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *Rollins*, 544 F.3d at 838. "The defendant bears the burden of proving that the PSR is inaccurate or unreliable," and if he offers no evidence to question the PSR's accuracy, the court may rely on it. *Id.*

There is sufficiently reliable information in the record to conclude that the Defendant is responsible for at least 1.5 kilograms of methamphetamine, which corresponds to a base offense level of 38. The Defendant does not dispute the probation officer's inclusion in the calculation the drug amounts the CS obtained directly from him or from Sandoval. The Defendant's challenge is to the inclusion of the 152.3 grams of methamphetamine that was found at the former location of Chilangos Tacos on May 23, 2013. The Court, finding that it is more likely than not that the drugs were left in the restaurant by the Defendant when he was trafficking drugs from that location, will overrule the objection.

The Defendant is the only drug dealer known to have used the premises. The drugs were the same kind and quality—over 99% pure methamphetamine—as the drugs the Defendant sold to the CS and to Sandoval during the time under investigation. Further, hiding the drugs under the sink between the wall and the pipes was consistent with the CS's observations that the Defendant used various hiding places in the kitchen to store the methamphetamine. It is not unreasonable to conclude that individuals cleaning at the location would uncover contraband that the officers executing the search warrant overlooked.[1] Adding these drugs to the other quantities known to have been provided by the Defendant yields an offense level of 38. *See* U.S.S.G. § 2D1.1(c)(1) (offenses involving 1.5 kilograms or more of actual methamphetamine corresponds to a base offense level of 38).

The Defendant also objects to the PSR's conclusion that the cash officers recovered from a safe located inside the restaurant where the controlled purchases occurred was drug proceeds. In converting the money to drugs, the probation officer explained that because $9,000 of buy money was among the $31,400 in the safe, the DEA stated that this was an indicator that all the money was derived from the drug trade. Instead of depositing money from drug sales in the bank, the Defendant kept it in a safe. Further, there were no receipts of business transactions indicating how the money was earned. The Court finds this reasoning persuasive, but does not determine what amount of the cash that was recovered in the restaurant safe should be converted

---

[1] In its response brief, the Government writes that the landlord took possession of the Chilangos Tacos space after the Defendant's arrest, and that it remained unoccupied until he provided the cleaning crew with a key so they could clean and remove restaurant equipment. These facts, and others provided in the Government's response brief, would lend further support to the conclusion that the drugs were left in the restaurant by the Defendant. These facts, however, are not included in the PSR or its Addendum and have not been presented to the Court in such a manner to verify their reliability. The Court finds it unnecessary to verify these facts, as the preponderance of evidence already supports the conclusion that the drugs are attributable to the Defendant.

to drugs because, even if the amounts were added, they would not affect the base offense level.

B.       **Drug Premises Enhancement**

Pursuant to Guideline § 2D1.1(b)(12), the offense level is increased by two levels if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." The application notes to this section provide that Subsection (b)(12) "applies to a defendant who knowingly maintains a premises . . . for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1, cmt. n. 17. The application notes explain that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.*

The Defendant argues that drug trafficking occurred infrequently, 8 times over 90 days or only about 9% of the time under investigation. Yet the question is not merely how often drugs were sold from the Defendant's restaurant; it is also how frequently he used the premises to advance the drug-trafficking conspiracy, "including" by "stor[ing] a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n.17. As the Government notes, the Defendant's calculation ignores "his constant use of the restaurant as a storage location for drugs and drug money and the restaurant's consistent availability to serve the needs of [the Defendant's] drug business both as a concealment method and a meeting location for drug distribution." (Resp. to Def.'s Sentencing Mem. 4, ECF No. 82.) In addition, the "frequency-of-use factor" is to be considered in tandem with the significance of the illicit activities conducted on the premises

when the premises can, by definition, be used for lawful purposes 100% of the time. *United States v. Flores-Olague*, 717 F.3d 526, 534 (7th Cir. 2013). For example, when the premises is also a primary residence, the factors to consider include not only the frequency of use, but a variety of other factors germane to the scope of illicit activities, such as the quantities dealt, customer interactions, storage of tools of the trade, maintenance of business records, and acceptance of payment. *Flores-Olague*, 717 F.3d at 534; *see also United States v. Sanchez*, 710 F.3d 724, 731 (7th Cir. 2013), *vacated on other grounds*, 134 S. Ct. 146 (2013) (noting that a sentencing court considering the enhancement should look to both the frequency in which prohibited uses occurred on the premises and whether those uses were significant in scope to determine whether the prohibited purpose can be fairly described as a "primary or principal" use of the premises); *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012) (holding that enhancement applies when a defendant uses the premises for the purpose of substantial drug trafficking activities even if the premises is also the family home). The frequency and significance factors are considered in tandem. Therefore, when the premises at issue is a functioning business, such as a restaurant, the factors to consider should not be limited to the frequency of use, but include a variety of other factors related to the scope of illicit activities.

Applying the approach from *Sanchez* and *Flores-Olague*, the Court finds that the application of the § 2D1.1(b)(12) enhancement is warranted. During the three-month time span under investigation, the CS purchased distribution amounts of crystal methamphetamine from the Defendant at Chilangos Tacos on six different occasions. During these transactions, the Defendant retrieved the drugs from the back of the restaurant and from hiding areas in the kitchen, including from a ceiling tile. He also counted money, consulted ledgers, and discussed

drug debts with the CS. For one transaction, the Defendant concealed meth inside an item he and Correa made to look like a decorated cake. The CS met with the Defendant at Chilangos Tacos on another occasion for the sole purpose of making partial payment on a drug debt. During this meeting, the Defendant attempted to convince the CS to distribute drugs for him in the Fort Wayne market.

This evidence supports the conclusion that the Defendant consistently used the restaurant as a base of operation for his trafficking activity. This use was an integral part of performing and concealing his drug distribution. The CS entered the restaurant like other customers and used the dining area to discuss business and complete transactions, and the kitchen area offered additional privacy for counting money, exchanging drugs, and discussing the details of the transactions. The Defendant exercised significant control over activities at the restaurant. He owned the restaurant, used any portion of it he wanted for his illegal activities, and involved Correa in drug related activities at the restaurant. Correa, as a result of her involvement, was charged with distributing methamphetamine on March 21, 2013, and with maintaining a drug involve premises in violation of 21 U.S.C. § 856(a)(2). She pled guilty and was sentenced on the drug-involved premises charge.

The use of Chilangos Tacos to provide storage for drugs and drug proceeds, and as a meeting place to distribute drugs, receive payment, and discuss the Defendant's drug business was not merely incidental to its lawful purpose. A preponderance of the evidence shows it to have been one of the primary uses of the restaurant. Accordingly, the PSR accurately provides for the enhancement under § 2D1.1(b)(12).

## C. Aggravated Role Enhancement

Paragraph 54 of the PSR applies a two-level enhancement to the Defendant's offense level on the grounds that he was an organizer, leader, manager, or supervisor of criminal activity. A defendant's offense level is increased pursuant to U.S.S.G. § 3B1.1(c) if he was an organizer, leader, manager, or supervisor of one or more participants in criminal activity. U.S.S.G. § 3B1.1, comment n.2. A participant is someone who is criminally responsible for the commission of the offense even if the person is not convicted. *United States v. Zuno*, 731 F.3d 718, 723 (7th Cir. 2013). Factors to consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. U.S.S.G. §3B1.1, comment n.4.

The Defendant argues that the enhancement is not applicable to him because he was the "consummate middle man." (Def.'s Sentencing Mem. 4, ECF No. 76.) He maintains that he obtained drugs from his supplier and passed them on to the CS, a person he insists he did not direct or control. The Seventh Circuit has held that "an upward adjustment under section 3B1.1(c) does not require an explicit finding that the defendant exercised control, so long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role." *United States v. Pira*, 535 F.3d 724, 730 (7th Cir. 2008) (quoting *United States v. Carrera*, 259 F.3d 818, 827 (7th Cir. 2001)). Under this standard, the enhancement applies.

First, the criminal activity involved more than one other participant. The Defendant's assertion that Correa was not involved in the drug trade does not have merit. Correa was a

participant in the Defendant's distribution of methamphetamine. She pled guilty and has been sentenced for her role in the offense, specifically for making Chilangos Tacos available for the Defendant to store and distribute methamphetamine. The CS and Sandoval were also participants.

Second, the Defendant maintained a coordinating or organizing role. The Defendant obtained the crystal methamphetamine from his supplier and determined where to store it. He selected the location of Chilangos Tacos, which Correa leased in her name and operated as a restaurant. He also coordinated the distribution of the drugs, including its sale price and delivery. On December 21, 2012, the CS was arrested with methamphetamine that she had obtained from the Defendant. She was on her way to deliver it to Sandoval in Fort Wayne, and had expected to make $1,000 for the delivery. The CS met with the Defendant to discuss being arrested, but claimed that she had dumped the distribution amount, 3 ounces, in a cup of pop to successfully avoid its detection. She told the Defendant that she was arrested with only a small, personal use amount of methamphetamine. The Defendant told the CS that she owed him $4,800 for the 3 ounces. Later, when the CS met with the Defendant to pay a portion of the debt, the Defendant attempted to recruit the CS to deliver drugs for him in Fort Wayne. He told the CS that he would sell a pound of methamphetamine for $22,000, and that the CS would make $2,000 for arranging the sale. The Defendant told the CS to coordinate a sale soon because the Defendant owed money himself for a large shipment of meth and the CS's debt only made it more difficult for him to pay his own debt. During another drug transaction, the Defendant showed the CS a paper that listed her debt and the payments made against it. When the CS asked to purchase 2 pounds of methamphetamine, the Defendant set the price at $19,000 per pound because he wanted to

make sure that the CS made money on the deal. When the CS went to the restaurant to purchase the 2 pounds of meth, the Defendant concealed the drugs in a cake form with the help of Correa.

These facts, and others contained in the PSR, reveal that the Defendant obtained the drugs from his source, stored them, arranged for further transport of the drugs to distributors, set the sale price and the delivery fee, directed concealment methods, stored the drug proceeds, and kept track of drug debts. The Defendant also appeared to have direct influence over Correa's involvement. The restaurant was leased in her name, yet the Defendant acted with impunity inside the establishment and completed drug transactions in her presence. The CS observed the Defendant arguing with Correa, who was crying, immediately before one drug transaction. The CS told investigators that Correa had made deliveries of methamphetamine to her in the past. The Defendant claims that the CS was not working for him. He points to the fact that the CS asked for money back when the Defendant did not have the quantity of drugs they arranged for (PSR ¶ 23), and the fact that the CS told the Defendant that she was in a hurry and asked if he was ready with the drugs (PSR ¶ 25). These facts do not lessen the Defendant's "relative responsibility" within the drug trafficking scheme. *See United States v. Bush*, 79 F.3d 64, 67 (7th Cir. 1997) (stating that the "overall focus under § 3B1.1 is relative responsibility within a criminal organization").[2] At the very least, the Defendant played a coordinating role in the distribution of large quantities of crystal methamphetamine in northeast Indiana. This is

---

[2] In attempting to make much of these facts, the Defendant necessarily ignores other statements in the PSR, such as when the Defendant told the CS during one drug transaction to go back out into the restaurant area, to be quiet after she asked if he counted $9,600, and that he would call her later about her request to buy 2 pounds of meth because he was busy. (PSR ¶ 28.) Moreover, the entirety of paragraph 23 reveals that when the CS asked for money back when the Defendant did not have the full weight of drugs they had arranged for, the Defendant "told the CS that he would go and get the rest of the methamphetamine and that the CS should come back." Contrary to the Defendant's assertion, this exchange does not make it clear that the CS was independent of the Defendant.

sufficient for an upward adjustment under § 3B1.1(c).

## CONCLUSION

For the reasons stated above, the Defendant's objections to the PSR are OVERRULED.

Sentencing is confirmed for Tuesday, April 15, 2014, at 1:30 PM.

SO ORDERED on April 14, 2014.

                                           s/ Theresa L. Springmann
                                           THERESA L. SPRINGMANN
                                           UNITED STATES DISTRICT COURT